IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:11-CR-95 |
| | ) |
| ANDREAS MARKUS BACHMANN, | ) |
| a/k/a "Andrew Bachman" | ) |
| a/k/a "Andy Bachman" | ) |
| | ) |
| Defendant. | ) |

FILED
IN OPEN COURT
MAR 12
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Superseding Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

### INTRODUCTION

1. Defendant Andreas Markus Bachmann (hereinafter "Bachmann" or "Defendant"), age 56, is a citizen and resident of Switzerland.

2. Beginning in or about 1994 and continuing through in or about 2013, within the Eastern District of Virginia and elsewhere, the Defendant did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons known and unknown to the United States to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service ("IRS") of the Treasury Department in the ascertainment, computation, assessment, and

1

11088889.2

collection of revenue: to wit: U.S. income taxes, in violation of Title 18, United States Code, Section 371.

3. Beginning in or about 1974, Bachmann began his career in the banking industry. Since approximately 1989, Bachmann has been employed as either a relationship manager and/or asset manager or in similar positions in the banking industry in Switzerland managing financial accounts custodied in Switzerland for clients located in various parts of the world.

4. From in or about 1994 through in or about 2006, a wholly-owned subsidiary of International Bank ("Subsidiary") employed Bachmann. Subsidiary maintained offices in Zurich, Lausanne, Lucerne and Basel. Subsidiary had approximately 90 employees, with 65 employees located in Zurich. Client accounts were spread among four teams of relationship managers and their assistants.

5. From approximately in or about 2006 through in our about 2009, Bachmann was employed by Asset Management Firm #1 ("AMF#1") in Zurich, Switzerland, as an asset manager where he continued to open and manage a number of undeclared financial accounts for U.S. customers.

6. From in or about 2009 through the present, Bachmann has been employed by Asset Management Firm #2 ("AMF#2"), as an asset manager where he continued to open and manage a number of undeclared financial accounts for U.S. customers. Beginning in approximately 2009, Bachmann began to encourage his U.S. customers with undeclared accounts to participate in the IRS's Voluntary Disclosure Program and declare their offshore financial

accounts. However, Bachmann continued to service undeclared accounts of U.S. persons who refused to follow his advice and declare their financial accounts to the IRS.

## BACHMANN'S DIRECT ASSISTANCE TO U.S. CUSTOMERS WITH UNDECLARED FINANCIAL ACCOUNTS

7.  Between in or about 1994 and in or about 2006, Bachmann worked in Zurich, Switzerland as an asset manager / relationship manager for Subsidiary. Bachmann reported directly to Swiss Bank Executive 1, the Head of the Private Bank in Zurich for Subsidiary. Swiss Bank Executive 1 reported to Swiss Bank Executive 2, the Chief Executive Officer of Subsidiary.

8.  During the course of his employment at Subsidiary, Bachmann oversaw an international clientele that over time grew from approximately 25 client relationships to 100 client relationships. Approximately 25 to 30 of those clients were U.S. persons.

9.  Bachmann knew that a number of the accounts held by U.S. persons that he managed were undeclared because he assisted the U.S. persons in a number of ways that facilitated the concealment of the undeclared financial accounts from the U.S. Treasury Department and the Internal Revenue Service.

10. For instance, on those occasions when a U.S. customer instructed Bachmann to withdraw funds from an undeclared account and send the money to the United States, Bachmann advised the U.S. customer that the transfer had to be broken into separate transfers in amounts that were each below $10,000 so as to avoid reporting of the transaction(s) to U.S. federal regulators. In addition, the process of making the requested payment to a U.S. client involved the transmission of check(s) to U.S. customers from correspondence banks located in the U.S.

because Subsidiary had a policy not to issue checks directly from the Subsidiary to the accountholder. As a result, the identity of Subsidiary and International Bank's identity as the transmitting payer was concealed.

11. On many occasions, Bachmann traveled to the U.S. to meet with his U.S. customers. Bachmann met with his clients in hotels, restaurants or in the clients' homes. During those meetings, Bachmann would review an account's status with a U.S. customer and provide investment advice by going over the latest account statement. Most U.S. customers had instructed Bachmann not to mail account statements to them in the United States. In those circumstances, Bachmann's visits were the U.S. customer's only opportunity to see documentation of their account's investments and performance.

12. If during a meeting a customer requested a copy of the account statement, Bachmann would inquire of the customer: "Do you really want to keep the statement?" He followed that question by informing the customer of the risks inherent in maintaining physical copies of their account statements in places where U.S. law enforcement authorities might be able to seize them and connect the client with the undeclared account.

13. Bachmann also understood that certain U.S. customers were evading their obligations to the U.S. Treasury and IRS because they did not request any supporting documentation from Bachmann or Subsidiary in order to assist them in preparing their U.S. tax returns. Bachmann understood that accurate reporting of tax returns to the IRS would have required the U.S. customer to request specific financial information from Subsidiary on an annual basis, such as interest, dividends, capital gains, etc., for each account held.

## USE OF NOMINEE TAX HAVEN ENTITIES TO CONCEAL U.S. CUSTOMERS' BENEFICIAL OWNERSHIP OF ACCOUNTS

14. A number of Bachmann's U.S. customers concealed their ownership and control of their foreign financial accounts by holding those accounts in the names of nominee tax haven entities, also known as structures, which were frequently created in the form of foreign partnerships, trusts, corporations or foundations. Bachmann understood that a number of his U.S. accountholders utilized structured accounts in order to conceal the U.S. customer's ownership from the U.S. Treasury Department and/or the IRS, among other U.S. government agencies.

## INTERNATIONAL BANK'S SPONSORSHIP OF DÖRIG AND DÖRIG'S BUSINESS OF FORMING NOMINEE TAX HAVEN ENTITIES

15. Bachmann most frequently dealt with Josef Dörig ("Dörig") in regard to the formation and/or maintenance of structures on behalf of clients, including U.S. customers. While Bachmann did not advise U.S. customers to form structures for their financial accounts, Bachmann knew that Dörig assisted a number of Bachmann's U.S. customers and others with forming and maintaining structures for the purpose of concealing the true ownership of the financial accounts.

16. An internal division of Subsidiary originally employed Dörig as part of its senior management. In approximately 1997, a representative of International Bank informed employees of Subsidiary that it was too risky for International Bank to have Dörig form and manage nominee tax haven entities for U.S. customers from within International Bank. Instead, International Bank announced that the formation and management of nominee tax havens should

5

be done from outside International Bank. International Bank instructed Dörig to form his own company that specialized in the formation and management of nominee tax haven entities.

17. Consistent with International Bank's direction, Dörig formed Dörig Partner AG, a Swiss trust company, and secured office space in Zurich, Switzerland. Dörig Partner's offices were located nearby both the offices of Subsidiary and International Bank. International Bank directed Subsidiary and others to use Dörig as the preferred choice for the formation and management of structures. Bachmann was aware that Dörig formed and maintained nominee tax haven entities for U.S. customers with accounts managed by relationship managers employed directly by International Bank. Dörig traveled to the United States to meet with and provide services to U.S. accountholders with undeclared accounts held in the names of structures at Subsidiary, including a number of Bachmann's U.S. clients.

18. In the event that a client notified Bachmann that he/she was traveling to Zurich, Bachmann would notify Dörig of the customer's impending arrival so that Dörig could have the opportunity to meet with the client in the event that any work was necessary to be performed with regard to the client's structure. In turn, Dörig informed Bachmann when a client had made arrangements to see Dörig in Zurich so that Bachmann could meet with the client to discuss the client's account holdings. Dörig, not the accountholder, routinely submitted an invoice for Dörig's services directly to the structured account by way of Bachmann at the Subsidiary. Bachmann, directed Subsidiary's finance department to pay Dörig's invoice out of the assets in the customer's structured account.

19. Subsidiary maintained a "Form A" in each accountholder's file. The Form A recorded the identity of the beneficial owner of the structured account. On numerous occasions,

Dörig submitted false Forms W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, to Subsidiary through Bachmann. Forms W-8BEN are used for, among other things, documenting that the beneficial owner of assets in an account at Subsidiary was not a U.S. person. The Forms W-8BEN that Dörig provided to Bachmann falsely represented that the nominee tax haven entity, or structure, was the beneficial owner of the assets in the undeclared account and not the actual owner, the U.S. customer. Bachmann acknowledges that the allegations contained in paragraphs 125, 127, 132, 133, and 134 of the superseding indictment are accurate statements concerning Dörig's and Bachmann's use of the Forms W-8BEN.

## BACHMANN'S TRAVEL TO THE UNITED STATES IN ORDER TO FURTHER THE SCHEME

20. From in or about 1994 to in or about 2009, Bachmann routinely traveled to the United States twice each year, once in the spring and once in the fall, to visit with U.S. customers. Bachmann's business trips to the United States usually lasted approximately two weeks. Bachmann called his U.S. customers one to two weeks prior to his departure to arrange meetings.

21. While Bachmann requested a travel budget for each year, Subsidiary had no formal procedure for approving travel. As a matter of practice, prior to traveling to the United States, Bachman notified Swiss Bank Executive 1 and Swiss Bank Executive 2 of the planned trip and its objectives, to service his U.S. accountholders – both declared and undeclared.

## BACHMANN'S UNREGISTERED INVESTMENT ADVICE REGARDING U.S. SECURITIES

22. Although neither Subsidiary nor Bachmann was registered with the U.S. Securities and Exchange Commission, Bachmann provided investment advice to U.S. customers

regarding U.S. securities and assets while traveling both in the United States and from his office in Zurich, Switzerland.

23. In or about 2001 or 2002, International Bank compliance representatives came to Subsidiary and presented training in connection with the recent Qualified Intermediary Agreement ("QI Agreement") entered into between International Bank and the Internal Revenue Service. As part of that training, International Bank representatives instructed Subsidiary's asset managers and relationship managers that they were no longer authorized to discuss U.S. securities with U.S. customers. Bachmann, other relationship managers and asset managers at Subsidiary, Swiss Bank Executive 1 and Swiss Bank Executive 2 attended the training.

24. Asset managers at Subsidiary did not broadly comply with International Bank's directive against advising U.S. accountholders regarding investments in U.S. securities. The management of Subsidiary condoned the violation of U.S. law and the Q.I. Agreement. For example, Bachmann complained to Swiss Bank Executive 2, the Chief Executive Officer for Subsidiary, about the QI Agreement and the limits it placed on activities in the United States. Swiss Bank Executive 2 instructed him with words to the following effect: "Mr. Bachmann: You know what we expect of you – don't get caught." Bachmann continued his discussions of U.S. securities with U.S. accountholders and continued to reference such discussions in the travel reports he prepared and distributed to his superiors and peers at Subsidiary.

25. International Bank's compliance representatives did nothing to assure compliance with the directive and no one was ultimately disciplined for continuing to discuss U.S. securities investments with U.S. customers.

26. Subsidiary's management had first-hand knowledge that asset managers were providing investment advice in the United States in violation of U.S. law and in contravention of the QI Agreement. For example, Swiss Bank Executive 1 accompanied Bachmann on a trip to the United States in or about 2004 and joined Bachmann in meetings with U.S. clients where investment advice was dispensed and banking transacted.

27. Bachman routinely prepared a written report of his travels upon his return from the United States. Bachman widely distributed these travel reports within Subsidiary, to Swiss Bank Executive 1, Swiss Bank Executive 2 and to other asset managers and/or relationship managers employed by Subsidiary. The travel reports detailed the cities and customers Bachmann visited, a summary of the business conducted on behalf of his clients, and general information Bachmann learned during his travels, including Bachmann's personal observations concerning the U.S. economy. The travel reports also usually included a description of the types of U.S. securities in which the clients invested.

### BACHMANN'S RECEIPT AND DISTRIBUTION OF U.S. CURRENCY WHILE IN THE UNITED STATES

28. Bachmann engaged in cash transactions in the United States on four separate trips. The first cash transaction in the United States occurred in approximately 2000.

29. In the course of arranging meetings with U.S. customers, some U.S. customers would request that Bachmann either provide them with cash as withdrawals from their undeclared accounts or take cash from them as a deposit to their undeclared accounts. Bachmann agreed to receive cash from U.S. customers only when he could find other U.S. customers that desired to receive cash.

11088889.2

30. As a policy, Bachmann did not transport currency when entering or departing the United States. On one occasion, in or about October 2001, Bachmann deviated from that policy. A U.S. customer met with Bachmann in New York City and gave him $50,000 in U.S. currency as a deposit to an undeclared account. Bachmann provide a receipt to the U.S. customer. Bachmann intended to ultimately deliver the $50,000 cash to a U.S. customer in South Florida but, first, had to travel to the West Coast. At a New York airport, the $50,000 in U.S. currency was discovered in Bachmann's carryon luggage. After brief questioning by a uniformed police officer, Bachmann continued his travels with the cash, first to the West Coast and then to South Florida. At the meeting in South Florida with the intended recipient of the cash, Bachmann advised the U.S. customer of what had transpired in New York. The U.S. customer refused to receive the money out of concern that Bachmann's brief encounter with law enforcement might lead to the discovery of the client's undeclared account. As a result, Bachmann returned to Switzerland with the $50,000 in cash in his checked luggage.

31. The management of Subsidiary was aware that Bachmann was dealing in cash in the United States. Upon his return to Switzerland, Bachmann informed Swiss Bank Executive 1 and Swiss Bank Executive 2 about the incident with the cash. Swiss Bank Executive 1 responded that he/she was glad nothing else happened. Bachmann continued his routine travels to the United States subsequent to the incident involving the $50,000 in U.S. currency.

### BACHMANN CONTINUED THE SCHEME AFTER LEAVING SUBSIDIARY

32. In or about 2006, Bachmann left Subsidiary's employment and joined AMF#1 as an asset manager. Bachmann brought approximately 50 to 60 clients from Subsidiary to AMF#1. Of those clients, approximately 20 were U.S. persons.

33. While at AMF#1, Bachmann continued to service U.S. clients with undeclared accounts. He continued to travel to the United States to meet with U.S. customers and provide investment advice and banking services until in or about April 2009. At that time the Chief Executive Officer of AMF#1 instructed Bachmann and the other asset managers to cease traveling to the United States to conduct business with U.S. customers. Bachmann complied with this directive.

34. However, in or about 2009, Bachmann traveled to Toronto and Vancouver, for the purpose of meeting with U.S. accountholders who had traveled from the United States to meet with Bachmann in those locations.

35. During his tenure at AMF#1, Bachmann continued to service U.S. customers with undeclared accounts through the use of U.S. jurisdictional means, including the use of the telephone and emails to initiate communications from Switzerland to the United States. Bachmann also met with U.S. customers when they traveled to Switzerland.

36. In or about 2009, Bachmann left AMF#1 because the firm planned to cease servicing the accounts of U.S. customers and the bank where assets were custodied ceased accepting U.S. customers.

37. In or about 2009, Bachmann and four other asset managers employed by AMF#1 decided to form AMF#2. While still employed by AMF#1, Bachmann and the four asset managers met with their U.S. customers and advised those customers that they were forming a new business.

38. Within six months of formation, the assets under management at AMF#2 grew from approximately CHF 130 million to CHF 400 to 500 million. As of 2011, Bachmann has requested all current U.S. customers to enter the IRS Voluntary Disclosure Program.

39. The acts taken by the defendant, Andreas Markus Bachmann, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate United States law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in the superseding indictment nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

By: *[signature]* 3-11-2014
Mark D. Lytle
Assistant United States Attorney

Kathryn Keneally
Assistant Attorney General
Tax Division

By: *[signature]*
Mark F. Daly
 Senior Litigation Counsel
Nanette L. Davis
 Assistant Section Chief - NCES

11088889.2

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Andreas Markus Bachmann and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Mr. Andreas Markus Bachmann,
Defendant

I am Mr. Bachmann's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
William A. Burck
Ben A. O'Neil
Counsel for the Defendant

11088889.2